**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| RLJCS ENTERPRISES, INC., et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )      No. 03 C 6080 |
| | ) |
| PROFESSIONAL BENEFIT TRUST, INC., | ) |
| et al., | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION**

Before the court are the parties' cross-motions for summary judgment on the issue of stock ownership and plaintiffs' motion to strike certain of defendants' statements of material fact and supporting affidavits and documents.  For the reasons explained below, the motions are treated as motions for <u>partial</u> summary judgment; defendants' motion is granted, and plaintiffs' motion is denied.  Plaintiffs' motion to strike is denied.

**BACKGROUND**

We will repeat here a brief summary of the facts of this case from an earlier opinion:

> Plaintiffs are former employer and employee participants in a multiple-employer benefits trust ("the Trust").  The employers participated in the Trust for the sole purpose of providing death benefits for their participating employees.  These death benefits were funded by life insurance policies that were purchased by the Trust with contributions made by the employers.  The Trust was designed to be a qualifying trust under section

419A(f)(6) of the Internal Revenue Code, which allows employers to realize a tax deduction for contributions made to certain employee benefit plans. See I.R.C. § 419A(f)(6).

At the heart of this dispute are life insurance policies purchased by the Trust from Canada Life and Sun Life on behalf of participating employees. When these policies were issued, Canada Life and Sun Life were both mutual insurance companies, or, "insurer[s] whose policyholders are its owners, as opposed to a stock insurance company owned by outside shareholders." BLACK'S LAW DICTIONARY 1041 (7th ed. 1999). However, Canada Life and Sun Life, in 1999 and 2000 respectively, "demutualized," which is "[t]he process of converting a mutual insurance company (which is owned by its policyholders) to a stock insurance company (which is owned by outside shareholders). . . ." Id. at 445.

As a result of these demutualizations, the Trust received shares of Canada Life and Sun Life stock (together, "the Demutualized Stock"). Then, in or around September 2000, the trustee of the Trust liquidated the Demutualized Stock for approximately $5,000,000, which the Trust has retained. Effective December 31, 2002, plaintiffs terminated their participation in the Trust. Upon their withdrawal, the Trust distributed to the participating employees their respective Canada Life and Sun Life insurance policies and their *pro rata* share of other related Trust assets. The distribution, however, did not include any of the sales proceeds from the Demutualized Stock.

This action followed. Plaintiffs have brought a 73-page, sixteen-count complaint alleging violations of civil RICO, 18 U.S.C. §§ 1961, *et seq.*, and ERISA, 29 U.S.C. §§ 1001, *et seq.*, as well as various common law breach of contract, fiduciary duty and fraud-based claims. The crux of the complaint is that the participating employees had an ownership interest in the Demutualized Stock and that defendants - the Trust and several related entities and individuals - unlawfully deprived the employees of that interest when their *pro rata* shares of the sales proceeds were not included in their distributions.

<u>RLJCS Enters., Inc. v. Professional Benefit Trust, Inc.</u>, No. 03 C 6080, 2004 WL 2033067, at *1 (N.D. Ill. Sept. 2, 2004) (footnote omitted).[1]

In our opinion of September 2, 2004, we indicated that much of the complaint hinges on the narrow question of ownership of the Demutualized Stock and therefore put that question on the front burner. Shortly thereafter, we instructed the parties to conduct discovery on the question of stock ownership, with a view to preparing dispositive motions on the issue. We later set a briefing schedule on cross-motions for summary judgment. After the parties filed their initial briefs, defendants filed a motion to strike plaintiffs' expert reports, and we stayed briefing on the summary judgment motions pending a ruling on the motion to strike. After we granted the motion to strike in most respects, briefing on the summary judgment motions resumed. Those motions have been fully briefed for some time now, but at a late stage of the briefing, plaintiffs filed a motion to strike various of defendants' documents and statements. We decided to take that motion along with the summary judgment motions, and the motion to strike was then briefed. All the motions are now fully briefed.

A few initial observations are in order. The first is that the summary judgment briefs and exhibits are ridiculously

---

[1] It appears that plaintiffs are seeking both stock proceeds and stock that was not sold. We will simply refer to the proceeds and the stock as the "stock" for convenience.

voluminous.  Upon reviewing the briefs, we are unable to understand why each side wanted to file its own summary judgment motion instead of briefing a single motion.  After seeing the huge stack of papers devoted to these motions, one would be surprised to learn that the issue is simple: who is entitled to this windfall of Demutualized Stock?  Each side merely had to set forth its supporting arguments for the contention that it is entitled to the proceeds.  Instead, the parties, particularly plaintiffs, have briefed many other issues that are somewhat factually related, but ultimately of very little use in determining the legal issue of ownership.

We also are compelled to remark that the briefs, chiefly those of plaintiffs, are marked by pettiness and a lack of civility.[2] The same sort of incivility creeps into defendants' briefs at points.  Our colleague, Judge Kennelly, confronted the problem of incivility and prudently remarked:

> It goes without saying that the parties on both sides of
> high-stakes civil cases often find their veracity,
> integrity, competence, and reputation under attack, not

---

[2]  In their reply brief regarding their motion for summary judgment, plaintiffs characterize defendants as (1) "danc[ing] a little sidestep" (curiously quoting from the movie "The Best Little Whorehouse in Texas," and providing a footnote to that effect, as if plaintiff's counsel is proud of the flippant remark); (2) "say[ing] what they need to say when they need to say it in order to make a point;" (3) "employing the fine art of shading and wordsmithing;" (4) "hid[ing] behind" the Plan documents. (Plaintiffs' Reply in Support of Summary Judgment Motion at 2, 5.)  In their reply in support of their motion to strike, plaintiffs provide another abrasive quotation--"Those who know the least know it the loudest"--and accuse defendants of "ignor[ing] the cold hard facts, ignor[ing] the law and say[ing] what they have to say." (Plaintiffs' Reply in Support of Motion to Strike at 1.)  These are just a few examples of the general snide tone that pervades many of plaintiffs' briefs.

> to mention their economic well-being. It is
> understandable that the parties in such cases sometimes
> take it personally and react negatively. But taking it
> personally is not the role of counsel. The lawyer's
> office does not include acting as the channeler of the
> client's anger and frustration. To put it another way,
> a lawyer is not, contrary to the colloquialism, a
> "mouthpiece" for his client. A lawyer representing a
> client can and must represent the client zealously.
> Sometimes, to be sure, this involves striking hard blows.
> But the punches must be thrown fairly. And personal
> attacks of the type made by the attorneys who filed the
> papers quoted above are rarely, if ever, justified. Our
> system of justice does not work, or at least does not
> work well, if lawyers act like professional wrestlers
> hyping the next match rather than as members of the
> honorable profession to which they belong.

Daniels v. Bursey, No. 03 C 1550, 2004 WL 1144046, at *2 (N.D. Ill.
May 19, 2004). Counsel are advised to refrain from using
inflammatory language in future filings.

The parties' unreasonable contentiousness is also displayed in
their multiple motions and requests to strike various documents or
statements. The briefing on the summary judgment motions was
delayed by the filing of the first such motion by defendants. The
motion was granted in large part. Plaintiffs then sent the court
a letter calling our attention to their own request, which had been
included within their response to defendants' motion to strike, to
strike the legal opinions and testimony of one of defendants'
witnesses, Thomas J. Handler. Thereafter, we issued a minute order
stating in relevant part:

> Defendants state that the "memoranda and documents
> authored by Handler and/or the Handler law firm are
> offered exclusively as *transactional* documents, *issued to*

> *the PBT Plan and its participants at the time of and as*
> *part of the transactions at issue.* These documents
> establish the very history of the facts of the case and
> are relevant as facts in the case." (Reply at 10.)
> Accordingly, these materials will not be stricken because
> they may assist the court on factual issues. Of course,
> to the extent that they do not bear on the *facts* of the
> case and contain legal analysis and conclusions that
> would usurp the province of the court, the legal analyses
> will be disregarded. At this juncture, though, it would
> be a waste of time to sift through each exhibit
> identified by plaintiffs to assess which portions are
> fact and which portions are legal opinion. Plaintiffs
> can rest assured that, when ruling on the motions for
> summary judgment, the court will disregard legal analysis
> and conclusions whether those analyses and conclusions
> are offered by plaintiffs or by defendants.

(Minute Order of December 1, 2005.) It is puzzling to us how this order could be construed as an invitation or suggestion to file another motion to strike, but a week after we issued the order, plaintiffs did just that. Plaintiffs move to strike (1) the affidavit of Tracy L. Sunderlage, one of the defendants; (2) the affidavit of Thomas J. Handler (whose testimony was the very subject of the minute order); and (3) certain excerpts of Sunderlage and Handler's deposition testimony; and (4) over 150 of defendants' Rule 56.1 statements of material fact. Plaintiffs have even submitted a proposed order seeking individual rulings on each and every paragraph in the affidavits to which they object, and on each and every fact statement. The same day plaintiffs filed their motion to strike, defendants filed a response to plaintiffs' Rule 56.1 Statement arguing that the entire Statement should be stricken.

Motions to strike are generally disfavored except when they serve to expedite.  See Heller Fin., Inc. v. Midwhey Powder Co., 883 F.2d 1286, 1294 (7th Cir. 1989).  These motions and requests to strike do not serve to expedite or streamline matters here; rather, the motions are unnecessary clutter and have only delayed briefing on the substantive motions.  We need not and will not wade through the Sunderlage and Handler affidavits, or through their deposition testimony, to provide a detailed analysis of why each paragraph or statement is or is not improper legal opinion, or conclusory, or based on hearsay.  We have found it unnecessary to even consider the statements in the affidavits and the deposition testimony to which plaintiffs object because they are not material to our ruling today.  Similarly, we need not and will not provide individual rulings on over 150 of defendants' statements of fact for relevance or hearsay objections, or dozens of plaintiffs' statements of fact. We will say as a general matter that many of plaintiffs' statements of "fact" do appear to contain inappropriate legal argument, and that plaintiffs' relevancy objections to many of defendants' statements of fact are unfounded.

Perhaps individualized rulings on some of the evidence or statements would have been necessary were the issue here not so simple.  But the only question before us at this point is ownership of the stock, and the relevant undisputed facts--which are far fewer than the facts that the parties have deemed relevant--will be

set forth in our discussion _infra_. It will be clear from our discussion and analysis which facts are relevant to the issues. Plaintiffs' motion to strike and defendants' request to strike will be denied.[3]

## DISCUSSION

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In considering such a motion, the court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. See _Pitasi v. Gartner Group, Inc._, 184 F.3d 709, 714 (7th Cir. 1999). "Summary judgment should be denied if the dispute is 'genuine': 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" _Talanda v. KFC Nat'l Mgmt. Co._, 140 F.3d 1090, 1095 (7th Cir. 1998) (quoting _Anderson v. Liberty Lobby, Inc._, 477 U.S. 242, 248 (1986)). The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its]

---

[3] One wonders what amounts of needless attorneys' fees have been generated by the creation of this mound of paper.

favor on a material question." <u>McGrath v. Gillis</u>, 44 F.3d 567, 569 (7th Cir. 1995).

## A.    **Additional Material Facts**

Defendant Professional Benefit Trust Multiple Employer Welfare Benefit Plan and Trust (the "Trust") was established in 1989.  It has provided specified employee welfare benefits for sixteen years and currently provides benefits for over 2500 employee participants in 300 employer groups.  The Trust is governed by the Professional Benefit Trust ("PBT") Multiple Employer Welfare Benefit Plan and Trust document, which has been amended from time to time.  Defendant Professional Benefit Trust, Ltd. ("PBTL") is the entity that is the Managing Trustee of the Trust, and defendant Tracy Sunderlage is CEO and Chairman of PBTL.[4]

Plaintiffs began participating in the Trust during the mid-1990s for the sole purpose of securing death benefits, but not severance, long-term care, or medical benefits.  In late 1997, the Trust amended the governing Trust document by issuing the PBT Third Amended and Restated Multiple Employer Welfare Benefit Plan and Trust ("the Third Amended Document").  The employer plaintiffs were provided copies of the Third Amended Document, a Summary Plan Description, and a 47-page legal opinion prepared by counsel for the Trust that addressed the operation of and participation in the Trust and the federal income tax and estate tax consequences.  Each

---

[4]  There are other related defendants whom we need not discuss.

employer plaintiff executed an Adoption Agreement formally agreeing to the Third Amended Document.

The Trust was designed to operate as follows. Covered employees, those whose employers participated in the Trust, would be entitled to a death benefit in an amount (relative to the employee's compensation) that was selected by the employer in the Adoption Agreement. The Trust funded these benefits primarily through the purchase of investment-grade insurance policies on the lives of the employees. The employers contributed to the Trust by paying the premiums on these life insurance policies; the Trust then paid the premiums to the life insurance companies.

The language of the Third Amended Document indicates that the Trust was intended to comply with § 419A(f)(6) of the Internal Revenue Code, 26 U.S.C. § 419A(f)(6), which would allow the employers to claim federal income tax deductions for their contributions. In a § 419A(f)(6) plan, the Trust must be the owner of the insurance policies, even though the policies are written on the employee participants' lives. Moreover, § 419A(f)(6) requires that there be a single plan, not an aggregation of individual plans, and that all plan assets be available for all employee participants instead of allocated to specific employers.

Most of the life insurance policies were purchased from The Canada Life Assurance Company ("Canada Life"), and one policy was purchased from Sun Life Assurance Company of Canada ("Sun Life").

In 1999 and 2000, respectively, Canada Life and Sun Life demutualized. The Trust had never experienced a demutualization, and evidently Sunderlage and his advisors were initially unsure about how to treat the stock windfall. There is no dispute that at the time of the demutualizations, the Third Amended Document was the governing Trust document. The Third Amended Document does not contain the words "demutualized stock" or include any provisions pertaining to the treatment of demutualized stock specifically. Plaintiffs' position was that they alone were entitled to the stock, and there were extensive discussions between plaintiffs' representatives and the Trust. The parties also obtained legal opinions concerning treatment of the stock. Eventually, the stock proceeds were deposited in the "Surplus Account" of the Trust,[5] and plaintiffs did not receive the stock or stock proceeds. The Trust reasoned that the stock was an "experience gain" that must be retained by the Trust in keeping with the Third Amended Document and § 419A(f)(6).

---

[5]/ Pursuant to the terms of the Third Amended Document, the "Surplus Account" receives "all experience gains" of the Trust. The Third Amended Document does not define the term "experience gain." It does refer, however, to some occurrences that are treated as experiences gains. It provides that after certain triggering events, if an employee or the beneficiary of the employee's death benefit does not purchase the insurance policy, the proceeds of the sale or surrender of the policy "shall be treated as an experience gain" and shall be governed by § 11.4 of the Document, which provides that experience gains are to be deposited in the Surplus Account. (App. to Defendants' Rule 56.1 Statement, Vol. I, Ex. 4, Third Amended Document, § 5.4.) The Third Amended Document also provides that unclaimed benefits become a part of the Surplus Account, and that excess assets remaining in the Trust after certain conditions are satisfied following an employer's withdrawal shall be treated as experience gains and credited to the Surplus Account. (Id., §§ 12.2, 12.3(b).)

Beginning in late 2002, the employer plaintiffs began to request to withdraw from the Trust; all but two of the employer plaintiffs withdrew effective December 31, 2002.[6] According to the Third Amended Document, when an employer withdrew from the Trust, the participant employees were entitled to receive their pro rata share of Trust assets, exclusive of the Surplus Account. Upon withdrawal, plaintiffs elected to keep their life insurance policies and "roll them over" to another account, and so the policies were distributed to the employee plaintiffs, along with excess funds that had been deposited in the Trust that temporarily had been invested in tax-free municipal bonds. Because this distribution was largely in-kind (consisting of the life insurance policies) instead of in cash, plaintiffs claim that the Trust did not actually make a calculation of their pro rata shares. In plaintiffs' view, the Trust did not comply with § 419A(f)(6) because it did not divvy up the Trust assets on a pro rata basis based on mathematical calculations. Defendants admit that they did not perform actuarial calculations when plaintiffs withdrew from the Trust, but state that the relevant calculations of the cash surrender values had already been made by the insurance companies that issued the policies. Defendants contend that when plaintiffs received the insurance policies, plaintiffs had actually

_____

[6] As for the remaining two employers, one withdrew on December 31, 2001, and the other withdrew on December 31, 2003.

"purchased" them by having their pro rata shares reduced by the cash surrender values of the policies.

**B.**   **Demutualized Stock Ownership**

The parties' briefs, voluminous as they are, fail to provide a framework for deciding the question of entitlement to the Demutualized Stock.   Instead, the parties plunge directly into their reasons why they believe they are entitled to the stock, without indicating why these factors matter in the overall equation.   Defendants contend that (1) the Trust was created and intended to comply with § 419A(f)(6), which requires that the value of the stock be held by the Trust for all ongoing participants; (2) defendants were authorized by the terms of the governing Trust documents to deposit the proceeds of the Demutualized Stock in the Surplus Account for the benefit of all Trust participants; and (3) plaintiffs are estopped from claiming any right to the stock because they accepted the Trust's welfare benefits and tax benefits and expressly agreed to the terms of the Trust documents. Plaintiffs, on the other hand, argue that they are entitled to the stock because (1) Sunderlage "repeatedly promised" to distribute it to plaintiffs when they terminated their participation in the Trust; (2) the Trust is a collection of individual welfare benefit plans instead of a single Trust of pooled assets that complies with § 419A(f)(6); and (3) the stock is not an "experience gain" that

the Trust was required to allocate to its Surplus Account under the terms of the trust documents or the law.

The proper framework for our analysis is provided in an opinion cited in plaintiffs' reply brief in support of their motion, <u>Chicago Truck Drivers, Helpers & Warehouse Workers Union (Independent) Health & Welfare Fund v. Local 710, International Brotherhood of Teamsters</u>, No. 02 C 3115, 2005 WL 525427 (N.D. Ill. Mar. 4, 2005) (Guzman, J.). <u>Chicago Truck Drivers</u> involved four employee-benefit plans that held insurance policies purchased from companies that demutualized. The issues were whether the demutualization proceeds were plan assets, and if so, whether the compensation reverted to the employees or to the employers. The court noted that ERISA does not define "plan assets," but that the Department of Labor[7] has issued advisory opinions concerning the treatment of demutualization compensation by benefit plans. An agency's advisory opinions are not binding authority, but they are entitled to deference if reasonable. <u>See</u> <u>id.</u> at *3.

A side note before plunging into our analysis. The instant case is unusual because the former employer and employee Trust participants are not adversaries; they have aligned themselves on the same side because the employer plaintiffs are the wholly-owned professional corporations of the employee plaintiffs. In the

---

[7/] "The Department of Labor shares enforcement responsibility for ERISA with the Department of the Treasury." <u>John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank</u>, 510 U.S. 86, 107 n.14 (1993) (citing 29 U.S.C. § 1204(a)).

typical scenario, as in <u>Chicago Truck Drivers</u>, the question would be whether the demutualized stock reverts to the employers or to the employees.  Here, plaintiffs--both employers and employees-- claim that the stock is not a plan asset and that they are entitled to the stock to the exclusion of the other participants in the Trust.[8]

According to the Department of Labor, "the assets of a plan generally are to be identified on the basis of ordinary notions of property rights under non-ERISA law.  This identification process includes consideration of any contract or other legal instrument involving the plan, including the plan documents.  It also requires the consideration of the actions and representations of the parties involved."  Dep't of Labor Advisory Op. 92-02A, at 2 (Jan. 17, 1992).  A more recent advisory opinion stated: "The proceeds of the demutualization will belong to the plan if they would [sic] deemed to be owned by the plan under ordinary notions of property rights. . . . In the case of an employee pension benefit plan, <u>or where any type of plan or trust is the policyholder</u>, or where the policy is paid for out of trust assets, it is the view of the department that all of the proceeds received by the policyholder in connection with a demutualization would constitute plan assets."  Dep't of Labor Advisory Op. 2001-02A, at 5-6 n.2 (Feb. 15, 2001) (emphasis added).

---

[8]/  Plaintiffs do not seek to recover any share of demutualized stock that may have been issued with respect to life insurance policies insuring the lives of <u>other</u> Trust participants.

In <u>Chicago Truck Drivers</u>, the court analyzed, among other plans, a life insurance plan that met ERISA's definition of an employee welfare benefit plan.[9]  The court found that because the employers made all of the contributions to the plan and because there was nothing in the language of the plan to suggest that demutualization compensation was intended to be a plan asset, the demutualization compensation was not a plan asset and reverted to the employers.  2005 WL 525427, at *8.

Plaintiffs maintain that under the analysis of <u>Chicago Truck Drivers</u>, they are entitled to the Demutualized Stock because the employers made the contributions to the Trust and because the Third Amended Document does not mention demutualized stock.  We disagree. The life insurance plan in <u>Chicago Truck Drivers</u> is distinguishable in two very important ways.  First, the policy at issue in that case was a group policy owned by the employers.  Here, the policies were owned by the Trust pursuant to the express language of the Third Amended Document:

> Each application for a policy, and the policies themselves, shall designate the Trustee as sole owner,

_____

[2/]    There is no <u>genuine</u> dispute that the Trust is an "employee welfare benefit plan" under ERISA, 29 U.S.C. § 1002(1)(A), because it provides benefits in the event of death.  The Trust documents contemplate a single plan, not a collection of plans. But plaintiffs argue, without authority, that the Trust is a collection of hundreds of individual employee welfare benefit plans instead of a single employee welfare benefit plan.  This position is relevant to their contention that the Trust did not operate in compliance with § 419A(f)(6) of the Internal Revenue Code.  However, for our purposes, the characterization "employee welfare benefit plan" is an ERISA determination that is independent of the Trust's status for tax purposes.  Indeed, plaintiffs themselves argue that the employee welfare benefit plan at issue in <u>Chicago Truck Drivers</u> is analogous to the Trust.  (Plaintiffs' Reply in Support of Summary Judgment Motion at 6.)

> with the right reserved to the Trustee to exercise any right or option contained in the policies, subject to the terms and provisions of this Agreement. The Trustee shall be the named beneficiary.
>
> . . .
>
> Subject to the right of a Participant Employee to make a Beneficiary[10] designation (and change such designation from time to time) the Trustee shall have full and complete control over any insurance policy as set forth in Section 14.4(k) hereof.
>
> . . .
>
> [T]he Trustee is authorized and empowered . . . [t]o apply for and own any life insurance policy of the Insurer held as an asset of the Trust Fund, and to exercise any option, privilege or benefit in connection therewith, including, without limitation, the right to collect and receive the cash surrender value proceeds and all dividends or other distributions thereof . . ..

(Third Amended Document, §§ 3.1, 5.2(a), 14.4(m).)  In compliance with the language of the Third Amended Document, the policies on the employee plaintiffs' lives were titled to the Trust and named the Trust as beneficiary.  The Adoption Agreements that the employer plaintiffs executed (in which they formally agreed to the Third Amended Document) stated: "All insurance policies and bond funds will be titled (owned) by TTEE, Independent Trust Company FBO Professional Benefit Trust."  (App. to Defendants' Rule 56.1 Statement, Vol. II, Ex. 16, Sample Adoption Agreement, art. XVI.)

A second distinguishing factor is that in <u>Chicago Truck</u>

---

[10]/ "Beneficiary" is defined by the Third Amended Document as "the person or persons or entity designated by a Participant Employee to receive the Death Benefit, if any, payable under the Plan." (Third Amended Document, § 1.1(d).) So, the Third Amended Document uses the term "beneficiary" in two different ways: uncapitalized, it refers to the named beneficiary of the life insurance contract, which was the Trust; capitalized, the term refers to the person or entity who was designated to receive the death benefit from the Trust pursuant to the terms of the Third Amended Document.

<u>Drivers</u>, there was nothing in the language of the plan at issue to suggest how to treat demutualization compensation. The plan document was silent in regard to possible assets such as dividends. In this case, however, there are indicia in the language of the Third Amended Document that demutualization compensation should be treated as assets of the Trust for the benefit of all Trust participants, not just plaintiffs. Because "ordinary notions of property rights" govern, first and foremost is the above-quoted language stating that the Trust owned the policies and had full and complete control over the policies. In contrast to <u>Chicago Truck Drivers</u>, the Third Amended Document contains a provision concerning dividends; the Trustee has "the right to collect and receive the cash surrender value proceeds and all dividends or other distributions thereof." (Third Amended Document, § 14.4(m).) Moreover, the following additional provisions giving the Trustee broad ownership and control, and disclaiming any ownership or control by employers or employees, support the treatment of the Demutualized Stock as an asset of the Trust:

- Upon termination of employment, the participant employees do not have the <u>right</u> to purchase the insurance policies; rather, the Trustee "may permit" them to purchase the policies for their cash surrender value. (§ 5.4)

- "The Employer shall have no right, title or interest in and to the contributions made by it to the Trust; and, no part of the Trust property, or *res*, nor any income attributable thereto, ever shall revert to the Employer or be used for, or be

diverted to, purposes other than for the exclusive benefit of the Participant Employees or for the payment of taxes and expenses of administration of the Trust.  No Participant Employee shall have any right, title or interest in and to any contributions to the Trust by the Employer, any portion of the Trust *res*, nor any portion of any income attributable to the Trust, except as may otherwise be provided herein.  (§ 8.3)

- "[N]o Participant Employee shall have any right, title or interest in any specific assets of the Trust Fund."  (§ 10.3(i))

- "[T]he Trustee is authorized and empowered" to manage, convey, and "otherwise deal with all property" "on such terms and conditions as the Trustee shall decide," in addition to other broad rights.  (§ 14.4)

Because the Trust owned the policies, it follows that the Trust owned the Demutualized Stock that flowed from the policies.

Plaintiffs argue in the alternative that even if the plaintiff employers are not entitled to the Demutualized Stock under a Chicago Truck Drivers analysis, the plaintiff employees are entitled to the stock pursuant to Ruocco v. Bateman, Eichler, Hill, Richards, Inc., 903 F.2d 1232 (9th Cir. 1990).  In Ruocco, the Ninth Circuit affirmed the district court's holding that demutualized stock reverted to the employee participants in a long-term disability insurance plan under a "balancing of the equities" test.  The court found that allowing the compensation to revert to the employers would give the employers an undeserved windfall because the plan contributions had been made by the employees.

We see no reason to apply Ruocco here. Like Chicago Truck Drivers, Ruocco involved a group policy evidently owned by the employer. Furthermore, we decline to "balance the equities" because in the instant case, there was a contract that governed the administration of the Trust, and that contract stated that the Trust, not the plaintiffs, owned the policies. Plaintiffs decided to become participants in the Trust and agreed to its terms, knowing from the outset that they would not own the policies, and indeed why they would not own the policies. The Trust had to be structured in that way so that it would comply with § 419A(f)(6), and so the employers would therefore receive tax benefits.

Given that the benchmark of our analysis is "ordinary notions of property rights" (pursuant to Chicago Truck Drivers, a case cited by plaintiffs themselves), plaintiffs' contentions--that defendants are "hiding behind" the Third Amended Document and that we should disregard the language of that document--are absurd. In our view, the language of the Third Amended Document is clear and controlling. Plaintiffs make much of their experts' legal opinions and of a private letter ruling by the IRS to the effect that in practice, the Trust did not actually comply with all of the requirements of § 419A(f)(6) at certain points in time. Defendants strenuously argue that it did, and the parties devote much of their briefs to the ins and outs of pooled assets, experience gains, and other esoteric characteristics of § 419A(f)(6) plans.

We do not believe that the plan's compliance with § 419A(f)(6) bears on the issue of ownership. Whether the Trust was <u>required</u> to treat the Demutualized Stock as an "experience gain" is also beside the point; whether the Trust <u>could</u> do so because it owned the Stock is the relevant issue. We look to what the parties intended at the outset, and that intent is evidenced in the governing Trust document. The plaintiffs contracted for death benefits; they did not contract for ownership of the life insurance policies or other assets. Plaintiffs cite no authority whatsoever to support their argument that we should ignore the language of the Third Amended Document and focus instead on the Trust's compliance with tax regulations.

Plaintiffs also assert that they are entitled to the stock because Sunderlage "repeatedly promised" to distribute the stock to them when they terminated their participation in the Trust. (It is disputed whether Sunderlage actually made any "promise," but we will assume for purposes of this discussion that he did.) The argument, however, stops at "he promised"; plaintiffs fail to explain what the legal effect of such a "promise" was. And as with their arguments concerning tax compliance, plaintiffs fail to cite any authority at all to support their position. Again, what is relevant is what the parties intended regarding ownership of the policies at when they agreed to the terms of the governing

documents, not what occurred years later when the Demutualized Stock was distributed.

Under ordinary notions of property rights, the Trust owned the policies. And it is not as if ownership by the Trust was some sort of decision made by a coin flip. Because they contemplated receiving (and did in fact receive) tax benefits, plaintiffs agreed to a welfare benefit plan structure in which the Trust was the policyholder. Because the Trust owned the policies, we hold that the Trust also owned the Demutualized Stock that was issued in relation to those policies.

A final note regarding the nature of our ruling. The parties have titled their cross-motions as simple motions for summary judgment. They are really motions for "partial" summary judgment on the issue of ownership because the parties have not identified which claims or counterclaims are affected by our ruling. It appears that our ruling today will dispose of most, if not all, of the case, but it is unclear exactly what is left of the claims and counterclaims. Therefore, the parties are directed to file cross-memoranda by June 23, 2006 and cross-responses by July 7, 2006, stating their views as to the effect of today's ruling on the claims and counterclaims in the case.

## **CONCLUSION**

For the foregoing reasons, the cross-motions of the parties are treated as motions for "partial" summary judgment on the

question of ownership of the Demutualized Stock. Defendants'
motion for partial summary judgment is granted, and plaintiffs'
motion for partial summary judgment is denied. Plaintiffs' motion
to strike certain of defendants' statements of material fact and
supporting affidavits and documents is denied.


DATE:      June 15, 2006


ENTER:     _____
           John F. Grady, United States District Judge